Bradford WEDRA, Petitioner–Appellant,

v.

Eugene S. LEFEVRE, Warden, Clinton Correctional Facility, Respondent–Appellee.

No. 424, Docket 92–2269.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1992.

Decided March 11, 1993.

Kenneth M. Tuccillo, New York City (Ivan S. Fisher, of counsel), for appellant.

John J. Sergi, Asst. Dist. Atty., Westchester County, White Plains (Carl A. Vergari, Dist. Atty., Westchester County, Richard E. Weill, Second Deputy Dist. Atty., Westchester County, of counsel), for appellee.

Before: MESKILL, Chief Judge, LUMBARD and WINTER, Circuit Judges.

MESKILL, Chief Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York, Leval, *J.*, entered on April 22, 1992. The district court denied Wedra's petition for a writ of habeas corpus sought pursuant to 28 U.S.C. § 2254. Relying on the United States Supreme Court's decision in *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640, *reh'g denied,* —— U.S. ——, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991), it concluded that Wedra's claims were procedurally defaulted. We affirm.

Wedra urges that *Coleman* is distinguishable because his state dismissal, unlike the dismissal at issue in *Coleman,* was not based exclusively on procedural grounds and because New York's procedural ground of dismissing untimely applications for leave to appeal is not strictly or regularly followed and therefore cannot be a basis for procedural default. Even if we disagree, Wedra argues, we should still reverse the district court's decision because retroactive application of *Coleman* to his habeas petition denied him due process. Wedra also contends that we should apply the deliberate bypass analysis to his petition because his procedural default does not implicate interests important to New York. Finally, Wedra claims that the refusal to consider his petition on a procedural technicality constitutes a fundamental miscarriage of justice.

We reject Wedra's arguments. *Coleman* clearly mandates the denial of Wedra's petition for a writ of habeas corpus, and the district court properly applied the decision retroactively. Because Wedra has not alleged cause and prejudice and we are not convinced that there has been a fundamental miscarriage of justice, we affirm the judgment of the district court denying Wedra's petition.

## BACKGROUND

The facts are fully set forth in Magistrate Judge Kathleen Robert's unpublished Report and Recommendation dated January 18, 1991. We summarize those facts necessary for an understanding of our disposition of the issues in this case.

On May 11, 1980, at approximately 3:00 a.m., Peter Molle was fatally shot in an alleyway adjoining a discotheque known as "Fudgie's Too" (Fudgie's) in Greenburgh, New York. Although there was a number of Fudgie's patrons in the parking lot in front of the club at the time of the shooting, there were no actual eyewitnesses to the murder.

During the year prior to the shooting, Wedra went to Fudgie's every weekend with his girlfriend of three years, Linda Borelli. Three weeks prior to the date of the shooting, there was a verbal exchange between Wedra and Molle at the club after Molle refused to move to allow Borelli and Wedra to pass. Eventually, Molle allowed the couple to walk by but he stood about three feet from them and continued to stare, primarily at Wedra, for about fifteen minutes after they sat down. Later that evening, in the front parking lot of Fudgie's, Wedra, Molle and others argued about the earlier incident for about fifteen minutes. The following weekend the three were again at Fudgie's and although Molle again stared at Wedra for between twenty and forty minutes there was no confrontation.

On the night of May 10, 1980, when Wedra and Borelli entered Fudgie's, Molle said "hello" to Wedra who did not respond. After the couple was seated, Molle stared at Wedra from about two to five feet away. Later in the evening when Wedra and Borelli got up to dance, Molle also danced, closely following them.

After dancing, Wedra left telling Borelli he was going to get some fresh air. Another Fudgie's patron testified that Wedra left between 2:20 and 2:30 a.m. Borelli observed that Molle remained where he was for a couple of minutes after Wedra departed and then also left. Borelli asked a bouncer to go outside to make sure everything was alright. Upon his return, the bouncer reported that the two were just talking.

The coatroom attendant, Laura Berardi, testified that she saw Wedra and Molle leave Fudgie's together at 2:50 or 2:55 a.m. She also testified that she saw Molle's identical twin brother leave the bar about three to five minutes later. Linda Pucci, who had been sitting in her car in the parking lot from approximately 1:15 a.m., testified that at approximately 2:40 a.m. she observed two men leave Fudgie's and go into the alleyway. About ten minutes later, she heard two gunshots and saw one of the two men come out from the alley holding his abdomen saying, "he shot me, he shot me" before falling to the ground.

Two bullets were recovered from Molle's body. A police search of the area surrounding Fudgie's failed to produce the gun or any other evidence. The Deputy Medical Examiner for Westchester County, Doctor Roh, testified that Molle's gunshot wounds were not consistent with a struggle. Roh explained that if a gun goes off accidentally in a struggle it is unlikely that there would be two shots and, if there were, both shots would be expected to be at close range. In the present case, the evidence showed one bullet was fired at close range and the other was not.

Borelli remained at Fudgie's until the club closed at 4:00 a.m. but Wedra did not return. When Borelli left the club she saw her car was still parked outside and she drove straight home. At 5:00 a.m. Wedra called her. When Borelli asked, "[h]ow could you do this to me?" Wedra responded, "I didn't do it." Wedra called Borelli again the next day and explained the incident. He told her that Molle had the gun and said, "[c]ome here, you piece of sh—. Do you think I want your piece of sh— girlfriend?" Wedra told Borelli he responded, "[y]ou can say whatever you want. You have the gun." Wedra also said that when he turned to walk back to Fudgie's someone yelled, "look out," a struggle ensued and the gun went off. Wedra claimed he then ran around the back.

Wedra and Borelli met a few days later at a shopping center. Wedra explained that he saw Molle get shot but did not recognize the assailant. When Borelli asked him where he was staying, Wedra responded, "never mind." Wedra also told Borelli to get a lawyer and he would see her again in a couple of weeks.

Several months later, on September 23, 1980, an indictment was returned by a Westchester County grand jury charging Wedra with Molle's murder. When the police went to Wedra's home he was not there although his parents were. The police returned to Wedra's residence six or seven times during the next week to ten

days. On one occasion, Detective Sergeant Hawkins spoke with Wedra's mother and told her why he was looking for Wedra. On October 16, 1980, Wedra surrendered at the Greenburgh Police Station with his mother and father and was placed under arrest.

At trial, the defense sought to discredit the testimony of the prosecution witnesses who identified Wedra leaving the club with Molle and to suggest that Molle was killed by Eddie Girdauskas, a regular Fudgie's patron, or by an unknown assailant who could have entered the alleyway from a rear parking lot. Wedra called four witnesses. Louise Ober, who lives several blocks from Fudgie's, testified that on May 11, 1980 between 2:30 a.m. and 2:45 a.m. she heard what seemed to be a fight. She heard someone screaming, "Eddie, don't, Eddie, please, Eddie, don't." She then dozed off and was awakened about 3:00 a.m. by what she thought to be firecrackers. Jan DeYorgi testified that she was standing outside of Fudgie's with several friends when she heard two gunshots and then somebody say "Ed, please, no more." Anthony Totora testified that on the night of May 10, 1980 he had a prearranged meeting with Molle to loan him $2,500 and, at about 11:45 p.m., he met Molle at Fudgie's and gave him the cash. Peter Filancia testified that he had a short conversation with Wedra during the early morning hours of May 11, 1980 and immediately after, at about 2:30 a.m., he saw Wedra leave the bar alone.

Anthony "Fudgie" Furgiuelle, the owner of Fudgie's, testified for the prosecution that on May 11, 1980 at about 2:30 a.m. he had ejected a patron from Fudgie's because he had gotten "out of line." While Furgiuelle, the patron and several others were outside of the club, Eddie Girdauskas approached the patron, at which point Furgiuelle said something to the effect of "Eddie, get back inside. Eddie, leave him alone."

On November 4, 1981, Wedra was sentenced to twenty years to life in the Supreme Court of New York on his conviction of murder in the second degree. He filed a timely notice of appeal on November 18, 1981 which was never perfected. On June 7, 1983, Wedra filed a motion pursuant to N.Y.Crim.Proc.L. § 440.10 (McKinney 1983) (C.P.L. 440.10 motion) to vacate the judgment in which he raised for the first time his constitutional claims. He contended that the prosecutor knowingly argued to the jury that the petitioner's flight evidenced consciousness of guilt even though the prosecutor knew from a contemporaneous police report that the petitioner had appeared in federal court during the period of his alleged flight. Wedra also argued that his counsel's representation was constitutionally defective because he failed to present evidence available to him to rebut the prosecution's argument that Wedra fled after the offense occurred. During oral argument on this motion, Wedra's counsel explained to the trial court that the appeal was never perfected because "no issue scream[ed] out ... that would require reversal."

On October 4, 1983, an acting justice of the Supreme Court of New York denied the C.P.L. 440.10 motion on the ground that the claims made by the petitioner were without merit. Wedra filed a notice of appeal from this decision on October 13, 1983 believing he could appeal as of right. He failed to seek leave of the Appellate Division to appeal the denial of his C.P.L. 440.10 motion within the requisite thirty day period as required by state law. *See* N.Y.Crim.Proc.L. §§ 450.15, 460.10(4)(a), 460.30 (McKinney 1983).

On July 19, 1984, the petitioner moved the Appellate Division for leave to appeal asking the court to excuse the lateness of his filing. The Appellate Division denied leave to appeal on the ground that it was untimely. The court noted that even if the appeal had been timely it would have denied it on the merits. On May 8, 1985, the New York Court of Appeals denied review of the Appellate Division's order on the ground that it was not appealable. *People v. Wedra*, 65 N.Y.2d 701, 491 N.Y.S.2d 1042, 481 N.E.2d 270 (1985).

On May 2, 1986, Wedra petitioned the district court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 asserting essentially the same claims raised in his C.P.L. 440.10 motion: his state murder conviction was procured in violation of his constitutional rights by reason of ineffective representation by his counsel and prosecutorial misconduct. Judge Leval referred the case to Magistrate Judge Kathleen Roberts for a Report and Recommendation on April 7, 1987. On June 22 and July 20, 1989, the magistrate judge held an evidentiary hearing. Magistrate Judge Roberts issued her fifty-two page Report and Recommendation on January 18, 1991. She found that Wedra's petition was not procedurally barred but recommended that it be denied on the merits. Both sides filed objections to the report. The deadline for comment expired on March 11, 1991.

The Supreme Court issued its opinion in *Coleman* on June 24, 1991. On June 26, 1991, Lefevre, the appellee, alerted the district court and Wedra's counsel that *Coleman* had been decided and was controlling authority. Three weeks later, Lefevre provided the court and opposing counsel with copies of the *Coleman* decision.

On April 15, 1992, the district court, relying on *Coleman*, denied Wedra's petition. It found that the petitioner's failure to make a timely appeal from the denial of his C.P.L. 440.10 motion constituted a procedural default and that the Appellate Division's decision to deny his appeal was based on the independent state ground of untimeliness. The court also found that the petitioner had not shown cause for the default or that actual prejudice resulted from the alleged constitutional violations or that a miscarriage of justice occurred.

Wedra requested a rehearing on the decision denying the petition on the ground that he never had an opportunity to address *Coleman* because it was issued after his opportunity for comment expired. The district court denied this request but issued a certificate of probable cause to appeal to this Court.

## DISCUSSION

We must decide whether the district court correctly applied the Supreme Court's

decision in *Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640, *reh'g denied*, —— U.S. ——, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991), to deny Wedra's petition for a writ of habeas corpus. In *Coleman*, the Supreme Court held that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* ——U.S. at ——, 111 S.Ct. at 2565.

### A. Independent and Adequate State Ground

Wedra argues that his habeas corpus petition is not procedurally barred. He contends first that the district court erroneously concluded that *Coleman* controls his case and that, in fact, the presumption established by the Court in *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), governs. We disagree.

■ *Harris* held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case ' "clearly and expressly" ' states that its judgment rests on a state procedural bar." *Id.* at 263, 109 S.Ct. at 1043 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985) (quoting *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983))). It established, therefore, a presumption that when a federal claim is denied without explicit reliance on state grounds, the merits of the federal claim are the basis for the judgment. The *Coleman* Court made clear, however, that the *Harris* presumption is to be applied "only when it fairly appears that a state court judgment rest[s] primarily on federal law or [is] interwoven with federal law, that is, in those cases where a federal court has good reason to question whether

there is an independent and adequate state ground for the decision." *Coleman,* —— U.S. at ——, 111 S.Ct. at 2559; *see also Ylst v. Nunnemaker,* —— U.S. ——, ——, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991).

■ The Order of the Appellate Division of the Supreme Court of New York denying Wedra's motion for leave to appeal stated in pertinent part: "ORDERED that the motion, insofar as it is for an extension of time to seek leave to appeal to this court, is hereby denied. If this application for leave to appeal was timely, this court ... would have denied same on the merits." [1] Wedra argues that this state dismissal is not based exclusively on procedural grounds but rather on a combination of substantive and procedural grounds. We are not persuaded. This order neither rests on federal law nor is it interwoven with federal law. Therefore, it does not provide us with "good reason" to question whether there was an independent and adequate state ground for the decision.

Although the order never explicitly states why the motion was denied, the reason is easily implied. The clause, "[i]f this application ... was timely" indicates that the motion was denied because it was untimely. This clause belies Wedra's argument that the decision was based on a combination of procedural and substantive grounds. Although the first sentence quoted above is written in the present tense, the second sentence establishes a condition that was never satisfied. Because the application for leave to appeal was not timely, according to the words of the order, the state court did not deny the motion on the merits. It denied the motion pursuant to an independent and adequate state procedural rule. The district court correctly relied on *Coleman* to find We-

dra's petition procedurally barred rather than applying the *Harris* presumption.

■ Wedra also argues that *Coleman* is distinguishable because New York does not have a history of "strictly and regularly following" the practice of dismissing untimely motions for leave to appeal, and therefore, this cannot be an "adequate state ground" upon which federal review may be foreclosed. Wedra contends that *Coleman* relied on Virginia's strict practice of not allowing appeals for which the notices of appeal were untimely filed as the adequate and independent state ground while in New York the policy is one of liberally granting untimely applications for leave to appeal.

New York law requires that a person who wishes to appeal the denial of a C.P.L. 440.10 motion to vacate a judgment make an application for a certificate granting leave to appeal to the intermediate appellate court within thirty days after service upon the defendant of a copy of the order sought to be appealed. N.Y.Crim.Proc.L. §§ 450.15, 460.10, 460.15 (McKinney 1983). Section 460.30 authorizes an intermediate appellate court to grant, in limited circumstances, an extension of time for taking such an appeal. N.Y.Crim.Proc.L. § 460.30 (McKinney 1983). To qualify for such an extension, a defendant must make a motion pursuant to this section with due diligence after the time for the taking of the appeal has expired but not more than one year thereafter. One of the circumstances that justifies an extension is improper conduct, death or disability of the defendant's attorney.

Unless the procedural rule is "strictly or regularly followed," a state procedural ground is not "adequate." *See, e.g., Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988).

---

**1.** The full text of the order is as follows:

The defendant having moved (1) pursuant to CPL 460.30 to extend his time to seek leave to appeal to this court from an order of the Supreme Court, Westchester County, dated October 4, 1983 and (2) for leave to appeal to this court if his time be extended;

Now, upon the papers filed in support of and in opposition to the motion, it is

ORDERED that the motion, insofar as it is for an extension of time to seek leave to appeal to this court, is hereby denied.

If this application for leave to appeal was timely, this court (MOLLEN, Presiding Justice) would have denied same on the merits.

However, "an allegedly uneven application of state procedural default rules *in general* does not necessarily establish that the application of a procedural default rule in a particular case is not 'adequate.'" *Andrews v. Deland,* 943 F.2d 1162, 1190 (10th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *see also Dugger v. Adams,* 489 U.S. 401, 410–12 n. 6, 109 S.Ct. 1211, 1217–18 n. 6, 103 L.Ed.2d 435, *reh'g denied,* 490 U.S. 1031, 109 S.Ct. 1770, 104 L.Ed.2d 205 (1989) ("[T]he few cases that respondent and the dissent cite as ignoring procedural defaults do not convince us that the Florida Supreme Court fails to apply its procedural rule regularly and consistently." *Id.* 489 U.S. at 411 n. 6, 109 S.Ct. at 1217–18 n. 6.). We are not convinced that simply because New York law allows some discretion to be exercised in the granting of extensions that a dismissal on the basis of untimeliness does not constitute an adequate procedural bar. Adequacy only requires application of the rule evenhandedly to all "similar claims." *Hathorn v. Lovorn,* 457 U.S. 255, 263, 102 S.Ct. 2421, 2426, 72 L.Ed.2d 824, *reh'g denied,* 458 U.S. 1131, 103 S.Ct. 15, 73 L.Ed.2d 1401 (1982) ("State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims.").

In his affidavit in support of his motion for an extension of time to move for leave to appeal the denial of Wedra's motion to vacate the judgment, Wedra's counsel acknowledged that his motion was untimely. He requested an extension because his failure to move timely was due to his error in believing that procedurally he could present all of the issues together under the main appeal and also due to a lengthy illness he had suffered between January and April of 1984. We note that this illness occurred well after the thirty day time period in which Wedra was required to move for leave to appeal and therefore is not relevant to Wedra's failure to move timely.

Wedra cites cases to support his claim that New York courts repeatedly have extended defendants' time to appeal when they have alleged that improper conduct of counsel impaired their ability to file timely. He notes there are relatively few reported cases dealing with this issue because the New York courts regularly grant motions for extensions under this section without an opinion. Lefevre argues that many of the cases Wedra cites are distinguishable. For example, he points out that some precede the effective date of section 460.30 and others involve application of the statute in regard to direct appeals as of right.

Wedra's counsel did not seek leave to appeal until more than nine months after the denial of the motion from which he was appealing. The only viable excuse proffered was that Wedra's attorney failed properly to read New York law. New York has codified in its criminal procedural law its practice concerning untimely motions for leave to appeal and the granting of extensions. Wedra has not sufficiently demonstrated to us that New York courts do not strictly and regularly apply these rules evenhandedly to *similar* claims to allow us to find that the procedural default in question was not an adequate state ground.

## B. ·*Retroactive Application of* Coleman

Wedra next argues that he was denied due process when the district court retroactively applied *Coleman* to find his petition procedurally barred. He contends that *Coleman* was not even decided until after the magistrate judge held a two day hearing on his constitutional claims and the parties extensively briefed those issues. He argues that, at that stage of his habeas proceedings, it was a denial of due process for the district court to refuse to allow him an opportunity to be heard on the effect of *Coleman.*

In *Penry v. Lynaugh,* 492 U.S. 302, 313–14, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989), a majority of the Supreme Court endorsed the retroactivity analysis for habeas petitions advanced by Justice O'Connor for a plurality in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334, *reh'g denied,* 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989). *See Wright v. West,* ── U.S. ──, ──, 112 S.Ct. 2482,

2489, 120 L.Ed.2d 225 (1992). Under *Teague*, a "new" constitutional rule of criminal procedure cannot generally be announced or applied on collateral review after a petitioner's conviction has become final. 489 U.S. at 310, 109 S.Ct. at 1075; *see also Penry*, 492 U.S. at 313, 109 S.Ct. at 2944.

There is a conceptual difficulty with applying the *Teague* retroactivity standard to Wedra's claim, which was very recently addressed by the Supreme Court in *Lockhart v. Fretwell*, — U.S. —, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). In *Teague*, the habeas petitioner sought to benefit from retroactive application of a new rule of criminal procedure favorable to his petition announced after his conviction had become final on direct appeal. Wedra, however, seeks to avoid retroactive application of a new rule that limits his right to federal habeas review. *Teague* was premised on the view that retroactivity questions in habeas corpus proceedings must take account of the nature and function of the writ. *See Wright*, — U.S. at —, 112 S.Ct. at 2490. Its reasoning was based on concerns about finality and intrusion into state criminal prosecutions. *Teague*, 489 U.S. at 308, 109 S.Ct. at 1073. This analysis makes sense when a federal court is deciding whether the state's reliance on an earlier rule warrants only prospective application of the new one. *See, e.g., United States v. Salerno*, 964 F.2d 172, 176 (2d Cir.1992). It ensures that a state is entitled to rely on the rule in effect at the time of trial in any cases in which direct review becomes final prior to the creation of the new rule. *See Harris v. Vasquez*, 949 F.2d 1497, 1542 (9th Cir.1990) (Reinhardt, J., dissenting),

*cert. denied*, — U.S. —, 112 S.Ct. 1275 (1992). As the Supreme Court concluded in *Lockhart*, however, this analysis is not appropriate when a court is faced with a defendant's claim of reliance on an old rule in the face of a new rule that is adverse to his interests.[2] — U.S. at —, 113 S.Ct. at 844.

In *Lockhart*, the Court stated that "[a] federal habeas petitioner has no interest in the finality of the state court judgment under which he is incarcerated: indeed, the very purpose of his habeas petition is to overturn that judgment. Nor does such a petitioner ordinarily have any claim of reliance on past judicial precedent as a basis for his actions that corresponds to the State's interest [we] described in ... *Butler*." — U.S. at —, 113 S.Ct. at 844. The *Butler* Court had explained that the *Teague* principle "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347, *reh'g denied*, 495 U.S. 915, 110 S.Ct. 1941, 109 L.Ed.2d 304 (1990).

*Lockhart* forecloses Wedra's argument that if a petitioner cannot retroactively apply a new rule to his benefit then due process requires that the state should not have the benefit of using the new rule to the petitioner's detriment. The Supreme Court explicitly acknowledged in *Lockhart* that "the State will benefit from [the] *Teague* decision in some federal habeas cases, while the habeas petitioner will not,"

---

**2.** Prior to the Supreme Court's decision in *Lockhart*, other courts applied the *Teague* analysis in determining whether a rule that limits a defendant's right to federal habeas review should be applied retroactively. *See, e.g., Andiarena v. United States*, 967 F.2d 715, 717 (1st Cir.1992) (applying *Teague* to determine that the rule announced in *McCleskey v. Zant*, — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517, *reh'g denied*, — U.S. —, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991), should be applied retroactively); *Harris v. Vasquez*, 949 F.2d 1497, 1512 (9th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992) (same). *McCleskey* held that the cause and prejudice standard applicable to cases of procedural default, *see, e.g., Wainwright*

*v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594, *reh'g denied*, 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 163 (1977), should likewise govern abuse of the writ jurisprudence. In *Harris*, two judges dissented from the rejection of a suggestion for a rehearing *in banc* and argued that *Teague* was not the proper retroactivity analysis for the rule announced in *McCleskey* that operates to contract the rights of defendants. 949 F.2d at 1539, 1541–44 (Reinhardt, J. dissenting). They suggested a court should instead inquire whether a defendant reasonably relied on an earlier rule and whether it would be inequitable to thwart such reliance by retroactively applying the new rule.

and concluded that this is "a perfectly logical limitation of *Teague* to the circumstances which gave rise to it." *Lockhart*, ── U.S. at ──, 113 S.Ct. at 844.

■ Wedra relies on our analysis in a civil case, *Byrne v. Buffalo Creek R.R. Co.*, 765 F.2d 364 (2d Cir.1985), to support his argument that *Coleman* should not be applied retroactively to his petition. Even were we to agree that this is the proper retroactivity analysis to use in a habeas petition, this reasoning still leads to the conclusion that Wedra's petition is procedurally foreclosed from federal review.

In *Byrne* we stated that, although the general rule is that a court must apply the law in effect at the time it renders its decision, "in the interests of justice, courts may exclude certain cases from the retroactive application of a judicial decision." *Id.* at 366. The three factors we used in *Byrne* to determine whether to do this were: "(1) whether the judicial decision establishes a new principle of law; (2) whether retroactive operation would advance or inhibit the new ruling's effect; and (3) whether retroactive operation 'could produce substantial inequitable results.'" *Id.* (citing *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) (quoting *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969))).

As to the first *Byrne* factor, it is clear from the language of the *Coleman* decision that the rule it announced did not break new ground. The *Coleman* Court stated: "In *Harris*, we described in broad terms the application of the cause and prejudice standard, hinting strongly that *Fay* had been superseded," and described the distinction between *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and subsequent cases as "irrational." ── U.S. at ── ── ──, 111 S.Ct. at 2564–65. We acknowledge that until *Coleman* was decided the Supreme Court never explicitly answered the question whether *Fay*'s deliberate bypass standard continued to apply when a state prisoner had defaulted his entire appeal. Therefore, under certain standards used to determine the newness

of a rule, the *Coleman* holding arguably would qualify as "new." *See, e.g., Chevron Oil Co. v. Huson*, 404 U.S. at 106, 92 S.Ct. at 355 (a case establishes a new principle of law when it overrules clear past precedent on which litigants may have relied). However, given that *Fay* was decided in 1963 and, as the *Coleman* Court observed, Supreme Court cases since *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594, *reh'g denied*, 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 163 (1977), have been unanimous in applying the cause and prejudice standard, *Coleman*, ── U.S. at ──, 111 S.Ct. at 2563, we would not consider *Coleman* to have established a new principle of law because its holding was "clearly foreshadowed," *see Chevron*, 404 U.S. at 106, 92 S.Ct. at 355 (a decision establishes a new principle of law when it decides an issue of first impression whose resolution was not clearly foreshadowed).

As to the second *Byrne* factor, the concerns of comity and federalism and the requirement that states have the first opportunity to correct their own mistakes that underlie the *Coleman* decision apply equally strongly to Wedra's petition. Therefore, the effect of *Coleman* would be advanced by applying *Coleman* here. Finally, we disagree with Wedra that if we applied *Coleman* retroactively to his petition it would produce substantial inequitable results. Wedra has already received a hearing on the merits of his constitutional claims before a magistrate who recommended that his petition be denied for lack of merit. We reject Wedra's contention that he was harmed by his reliance on *Fay*. He cannot argue that he relied on *Fay* at the time of his state procedural default because to do so would admit he deliberately bypassed state procedures which would foreclose review of his petition even under *Fay*. Having concluded that there is no merit to his claims that we should not apply *Coleman* to his petition, we are not persuaded by Wedra's argument that he was harmed by his inability to make these same arguments to the district court.

■ We conclude, therefore, that Wedra's argument that the district court should not have retroactively applied *Coleman* is without merit. Our conclusion is buttressed by the *Coleman* Court's application of the cause and prejudice standard to the habeas petition pending before it in a capital case. *See, e.g., United States v. MacDonald*, 966 F.2d 854, 858 n. 6 (4th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 606, 121 L.Ed.2d 542 (1992) (reasoning that regardless of whether *McCleskey v. Zant*, — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517, *reh'g denied*, — U.S. —, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991), announced a "new rule" the fact that the *McCleskey* Court applied its decision to McCleskey's habeas petition requires retroactive application in other pending cases). As Lefevre argues, our conclusion that *Coleman* should be applied to Wedra's petition is also supported by other circuits that have applied *Coleman* to habeas petitions pending at the time *Coleman* was decided. We note that the cases Lefevre cites were decided before the Supreme Court decided *Lockhart* and apply *Coleman* retroactively without addressing the retroactivity issue. *See, e.g., Gilbert v. Scott*, 941 F.2d 1065, 1067 (10th Cir.1991); *see also Johnson v. Singletary*, 938 F.2d 1166, 1175 (11th Cir. 1991), *cert. denied*, — U.S. —, 113 S.Ct. 361, 121 L.Ed.2d 274 (1992) (applying retroactively *Coleman*'s holding that a petitioner must bear the risk of attorney error in state post-conviction proceedings that results in procedural default).

### C. *Deliberate Bypass*

■ Wedra next argues that the deliberate bypass analysis should be applied because the procedural default does not implicate interests that are important to New York. He contends that even if *Coleman* does apply retroactively, his procedural failure cannot be compared to petitioner's failure in *Coleman*. In that case, he argues, the Virginia rule at issue was mandatory and strictly enforced and here New York's deadline is not mandatory and default is ordinarily excused for an attorney's improper conduct, death or disability. The *Coleman* Court stated:

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

— U.S. at —, 111 S.Ct. at 2565. Wedra's attempts to distinguish *Coleman* are unconvincing. Because we have decided that the district court's retroactive application of *Coleman* to Wedra's petition was correct, we will not apply the deliberate bypass test.

### D. *Fundamental Miscarriage of Justice*

■ Finally, petitioner argues that his conviction was a fundamental miscarriage of justice. He claims he has steadfastly maintained his innocence and was convicted of murder solely on circumstantial and doubtful evidence. He contends that his constitutional rights were violated by ineffective representation of counsel and prosecutorial misconduct and that these violations led to his conviction. In an "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2640, 91 L.Ed.2d 397 (1986); *see also Gonzalez v. Sullivan*, 934 F.2d 419, 422 (2d Cir.1991). We are not convinced that this is such an extraordinary case.

The prosecution presented sufficient evidence aside from the issue of flight on which the jury could have convicted Wedra. Borelli testified that on the date in question she saw Molle leave shortly after Wedra left Fudgie's. Another Fudgie's patron, Peter Filancia, testified that Wedra left alone about 2:30 a.m. Borelli also testified that a bouncer she sent outside to check on Wedra and Molle told her that the two were just talking.

The coatroom attendant testified that she saw Wedra and Molle leave Fudgie's together at 2:50 or 2:55 a.m. A woman in the parking lot testified that she saw two men who fit the general description of Wedra and Molle leave Fudgie's and enter the alleyway moments before the shots were fired. Doctor Roh's testimony that the gunshot wounds were not consistent with a struggle discredited the explanation Borelli said Wedra gave her about the events. There was also evidence that Molle and Wedra had a confrontation the week before and that Wedra never returned to Fudgie's after the shooting even though his girlfriend Borelli remained there waiting for him.

There is nothing in the record that leads us to conclude that the alleged constitutional violations resulted in the conviction of one who is actually innocent.[3] We note that the magistrate judge, after presiding over an evidentiary hearing, concluded that the petitioner failed to establish that he was prejudiced by the alleged omissions of his attorney or by the alleged prosecutorial misconduct.

## CONCLUSION

The state rejected Wedra's claim on the basis of procedural default, an independent and adequate state ground. Wedra does not argue that he satisfies the cause and prejudice standard. Therefore, because we hold that no miscarriage of justice occurred, the district court correctly denied Wedra's petition for a writ of habeas corpus.

The judgment of the district court is affirmed.

---

**3.** Wedra points to testimony by two of his witnesses that Molle screamed and begged someone named "Eddie" to stop just before the shots were fired as evidence of the weakness of the state's case. Wedra also argues that the state's primary identification witness, the coatroom attendant, changed her story to the grand jury after she was given $2,500 by the victim's family allegedly to repay a loan. The jury could have credited the prosecution's explanation that there had been an earlier incident where the owner of Fudgie's had yelled at someone named "Eddie" to stop him from interfering with another patron who was being thrown out of the bar rather than the defense theory that Eddie was the killer. Even if the alleged impropriety involving the coatroom attendant were true, there was sufficient evidence aside from her testimony to support the jury's verdict.