**Stephen GAGNE, 84–A–4007, Plaintiff,**

v.

**Thomas COUGHLIN, Superintendent, Defendant.**

**No. 95–CV–1567 (ERK).**

United States District Court,
E.D. New York.

Dec. 5, 1996.

George J. Hinde, New York, NY, for Plaintiff.

Richards Brown, Queens County Dist. Atty. by Robin Forshaw, Asst. Dist. Atty., Kew Gardens, NY, for Defendant.

## AMENDED MEMORANDUM & ORDER

KORMAN, District Judge.

Petitioner Stephen Gagne seeks habeas corpus relief from his 1984 New York State conviction for intentional and felony murder and first degree burglary. After a jury trial, petitioner was sentenced to two concurrent terms of twenty-five years to life and one concurrent term of twelve and one-half to twenty-five years. The Appellate Division affirmed the conviction on April 27, 1987, *People v. Gagne*, 129 A.D.2d 808, 514 N.Y.S.2d 799 (2d Dep't 1987), and Judge Bellacosa denied his application for leave to appeal on July 21, 1987. 70 N.Y.2d 704, 519 N.Y.S.2d 1038, 513 N.E.2d 715 (1987). Although petitioner's motion for reconsideration of his leave application was granted, he was again denied leave. *People v. Gagne*, 71 N.Y.2d 1027, 530 N.Y.S.2d 562, 526 N.E.2d 54 (1988).

The underlying crimes were committed on the morning of April 6, 1983, when petitioner, his girlfriend, and his brother broke into the girlfriend's mother's apartment. During the course of the robbery, the mother, Palmina Bell, was strangled. Two days later, both petitioner and his girlfriend, Donna Bell, confessed to the crime. Petitioner's primary ground for relief is that his confession should not have been admitted into evidence. His second contention is that the prosecutor's references during the trial to Donna Bell's confession violated the Confrontation Clause.

### Facts

Petitioner was afforded a lengthy suppression hearing, conducted jointly with both codefendants and occupying several full days spread over three months. The evidence at the hearing, which included petitioner's own testimony, did not support petitioner's claim that his confession was coerced. That evidence, detailed below, essentially established that, after petitioner and Donna Bell agreed to go to the police station for questioning, petitioner voluntarily remained there until Donna confessed. Following Donna's confession, petitioner received *Miranda* warnings, voluntarily confessed, and was arrested.

At the trial, however, police testimony, also summarized below, revealed that petitioner had been arrested several hours prior to confessing. Moreover, just after the arrest, petitioner was questioned without the benefit of *Miranda* warnings. Although petitioner did not make any incriminating statements at that time, he argues that the improper initial questioning tainted the subsequent interrogation.

### People's Suppression Hearing Evidence

According to the police officers who testified at the suppression hearing, petitioner telephoned the Queens Task Force at approximately 5 P.M. on April 7, 1983, and asked whether the police were looking for him. He was told by Sergeant Plansker that the police did wish to speak to both him and Donna Bell. At this time, petitioner and Donna were not suspects. When petitioner told police that they would be coming in from Bayshore, Sergeant Plansker told him that police detectives would pick them up and drive them to the station.

At Sergeant Plansker's request, Detective McCarthy and Sergeant Mobilio drove to Bayshore to pick up petitioner and Donna.

McCarthy testified at the suppression hearing that they were not suspects at that time, that he did not arrest them, did not read them their rights, and did not attempt to question them about the murder. HD 6.[1] While en route to the station, petitioner asked if they could go back and get his car so that he could drive himself to the station. The police informed petitioner that they were already approaching the station and that the police would drive petitioner back to his car later. HD 11. At approximately 7 P.M., petitioner and Donna Bell arrived at the stationhouse and were taken upstairs to a squad room, where they were told to sit on a bench on the second floor. Petitioner remained unattended on or around the bench while officers interviewed Donna in another room. When Donna Bell's brother arrived at the station at approximately 9 P.M., he observed petitioner, unescorted, making a phone call from a pay phone. HC 105.

At approximately 9 P.M., Detective Donaldson took Donna Bell into his office. He advised her of her *Miranda* rights as per "standard operating procedure," but did not consider her a suspect at that time. The initial interrogation was not fruitful, but Donaldson again questioned Donna at approximately 10 P.M. after informing her that a witness placed her at her mother's house at the time of the murder. This time, Donna admitted that on April 5th she, petitioner, and Louis Gagne had driven to her mother's house at approximately 5 A.M. intending to burglarize the apartment while her mother slept. According to Donna, she sat in the car while petitioner and his brother entered the apartment. Forty minutes later, petitioner and his brother came running out of the apartment and petitioner told her that he had strangled her mother when she awoke during the robbery. Donaldson took notes of the interview and had Donna sign them. Donaldson testified at the suppression hearing that after Donna had given her statement, petitioner would not have been free to leave the stationhouse, even though he was not yet arrested. HB 35.

The key factual issue concerns what happened to petitioner at approximately 11 P.M., just after Donna Bell confessed. At the suppression hearing, Sergeant Carpenter, who was called as a witness by Donna Bell, testified under cross examination by petitioner's counsel that, after leaving the room where Donna was answering questions, he attempted to question petitioner. HC 138. The cross examination at the suppression hearing was very brief, no more than a few questions, and left this aspect of the testimony undeveloped. Significantly, Carpenter never indicated where petitioner was at the time of this brief exchange, nor did he recount what, if anything, petitioner said in response.

Exactly what petitioner was doing for the next few hours was not clarified at the suppression hearing. The next person to have direct contact with petitioner was Detective Bottari, who testified that, at approximately 3:30 A.M., he escorted petitioner from the bench in the squad room into an office for an interrogation. Although Detective Carpenter was one of two additional detectives present during Bottari's interrogation, Bottari testified at trial that he was unaware that any other officer had previously attempted to question petitioner. After Bottari advised petitioner of his *Miranda* rights and petitioner indicated that he understood them, Bottari informed petitioner that Donna had told police that petitioner killed her mother. HB 87. As Bottari began to ask questions about the night of the murder, petitioner began to cry and stated that he could not believe Donna had made her statement. HB 88. Bottari then brought petitioner to the room where Donna was giving a videotaped statement to Assistant District Attorney Mark Furman. HB 88. Petitioner was permitted to peek inside the room and then was brought back to his interview room. Bottari

---

1. The transcripts of the proceedings are not sequentially numbered. The parties have both adopted something similar to the following citation system:

Suppression Hearing Transcripts
HA   — August 11–12, 1983
HB   — September 12, 1983

HC   — September 20, 1983
HC2   — September 21, 1983
HD   — November 18 and 21, 1983
HE   — November 23, 1983
Trial Transcripts
Tr.   — May 14–18, 1984
Tr.#2   — May 21–23, 1984

also told petitioner that his brother, Louis, was in custody, but this was not true.

After seeing Donna confessing, petitioner confessed to the crime. He told Bottari that he had gone to Palmina Bell's apartment with Donna and Louis because Donna had wanted her mother killed. Petitioner said, contrary to Donna's statement, that Donna had been present in the apartment. He informed Bottari that Donna and Louis had nothing to do with the murder but then said that he could not say that he had because, if he did, "how can I plead not guilty in court?" HB 76. At approximately 4 A.M., ADA Furman was informed that petitioner had made a statement but that he did not wish to make his statement on videotape.

Later, while being driven to Central Booking, petitioner told Detective Kelly that Donna had always wanted to have her mother killed and that petitioner had told her that killing her was not necessary and that he wished he had never met Donna. HB 77. During the suppression hearing, the prosecutor agreed that this statement would not be introduced in the direct case. Tr. 7.

*Petitioner's Testimony at the Suppression Hearing*

Petitioner's testimony, which the presiding judge did not credit, differed in several important respects from the version offered by the officers who testified. Specifically, petitioner testified that when McCarthy arrived to pick him up and transport him and Donna to the station, McCarthy told petitioner that he was being placed under arrest. Petitioner testified that he asked to be permitted to call his attorney and was permitted to do so but reached only an answering machine and opted not to leave a message. HD 26. McCarthy then handcuffed petitioner, but not Donna, before placing them in the squad car. HD 27. Petitioner testified that before they left he asked to be permitted to drive his own vehicle but the request was refused. HD 27. Petitioner also testified that he was not read his *Miranda* rights at that time, but was questioned by McCarthy. HD 28.

Petitioner testified that, once at the stationhouse, he was handcuffed to a bench but after ten minutes the handcuffs were removed. HD 29. He asked to telephone his attorney but was denied permission to do so

until 7:30 P.M. when McCarthy took him downstairs to use the phone. Petitioner tried to call his attorney but reached an answering machine and again did not leave a message. HD 32–33. Instead, he called his aunt and asked her to continue trying to reach the attorney. HD 47.

According to petitioner, after making his phone calls he was brought into an interrogation room by Donaldson and several other detectives who took turns asking him questions from 8 P.M. to 10 P.M. HD 34; HE 30–31. Petitioner claimed that he was not informed of his *Miranda* rights prior to this interrogation. After this session, petitioner was returned to the bench, where he sat for approximately an hour before Donaldson informed him that he was under arrest for murder. During the next several hours petitioner was questioned and asked whether he wanted to make a statement. Petitioner protested his innocence and indicated that he did not believe that Donna was making a statement. At approximately 2:30 A.M., petitioner was told that if he did not believe Donna was making a statement he could observe her doing so. After the officers allowed petitioner to glimpse Donna making her statement, he was placed in a jail cell and later transported to central booking.

Petitioner admitted on cross examination that prior to this arrest he had been arrested several times and had been advised of his rights during those arrests. HD 40.

*The Motion to Suppress is Denied*

In a written opinion, Justice Posner denied Donna Bell's and petitioner's suppression motions. Resp. Ex. B. With respect to petitioner, Justice Posner found that petitioner had "voluntarily remained in the stationhouse while Donna Bell was being questioned by the police." Justice Posner found that the statement made to Bottari at 3:30 A.M., after petitioner was advised of his rights and after petitioner saw Donna making her statement, was voluntarily made. "The Court does not credit the testimony of the defendant, Stephen Gagne, that he was questioned by the police earlier that night without benefit of *Miranda* warnings, nor does the Court credit his testimony that he had requested and attempted to contact an attorney."

*Trial Testimony*

Petitioner was tried separately from his codefendants. At trial, Sergeant Carpenter testified that after he interviewed Donna Bell, he conferred with Detective Crowe and Lieutenant Kelly and they decided that petitioner should be arrested. Following instructions from Kelly, Crowe arrested petitioner and placed him in a detention cell at approximately 11 P.M. Tr. 263. Carpenter then tried to question petitioner without first advising him of his rights. Carpenter testified, "I asked him if he wanted to talk to me," Tr. 286, and petitioner responded, "I just don't want to talk to you." Tr. 269–71. Carpenter then ceased questioning petitioner and left the area.

*Renewed Suppression Motion*

At the conclusion of Carpenter's trial testimony, defense counsel moved to reopen the suppression hearing. Tr. 287. The details of the colloquy surrounding the application are significant because they pertain to respondent's argument that petitioner's claim is procedurally barred.

When defense counsel, Mr. Schwed, moved to reopen the hearing, he explained:

> Your honor in his decision did not strike [sic] any of the testimony of Steven Gagne, specifically in your Honor's decision that he was questioned by police earlier that night prior to Detective Bottari questioning. During the entire hearing no officer admitted or was willing to dispute that the defendant was arrested prior to 3:30 in the morning. Or that he was in custody. Clearly from Detective Carpenter's testimony he was arrested at 11:00 o'clock in the morning [sic]. That he was placed in the pen.

Tr. 287. In response to the application, Justice Posner stated:

> So whatever [petitioner] told Carpenter at that time is stricken and since the people have offered no statement concerning anything that he told Carpenter you have made a moot point. In other words, it's a valid *Huntley* issue that you have raised but there is nothing to [sup]ress because nothing was said.

Tr. 288. Defense counsel then pressed his point, arguing that "[t]he question is whether or not to have a defendant in custody for a period of 4 to 4 and [a] half hours and an attempt made to question him without benefit of his rights" might render the subsequent confession inadmissible. Tr. 288.

Justice Posner refused to reopen the suppression hearing but did offer counsel an opportunity to submit a memorandum of law on the issue. He also permitted counsel to argue the voluntariness of the confession to the jury and agreed to include in his jury charge the defendant's factual "contention" that petitioner had invoked his right to remain silent when questioned by Carpenter. Tr.# 2 39k.

In response to a question from the prosecutor, Ms. Bransten, the new suppression issue was further clarified during the following discussion:

> THE COURT: ... The issue is he was arrested [at] 11:00 o'clock between 11:00 o'clock and 3:00 o'clock. Mr. Schwed is making some kind of a claim that he should have been given his *Miranda* warnings much earlier; is that the claim?
>
> MR. SCHWED: Also the claim that he was questioned after his arrest without being given his rights and that's a violation.
>
> MS. BRANSTEN: Judge I would like the record made clear.
>
> THE COURT: I don't consider the question[,] Do you want to talk to me on [sic] questioning? It's a preface if the answer was yes, and if then detective Carpenter did not read him his *Miranda* rights and asked him specific questions, obviously that would be a violation. But all Detective Carpenter said was he asked the defendant, do you want to talk to me, and the answer was no. I don't want to talk to you. And that was the end of the conversation.
>
> MR. SCHWED: The issue which I will submit to Your Honor in a memorandum is once the defendant indicates he does not want to speak, the police don't have the right to keep asking him any time after.
>
> THE COURT: He said the defendant said I don't want to speak to you. Detective Carpenter never said that the defendant said, I don't want to speak to any police officer, I don't want to talk, I want a

lawyer, nothing of that nature was testified to by Detective Carpenter.

Tr. 290–291. After some additional attempts by the judge to distinguish between not wanting to talk to Carpenter and wishing to remain silent, defense counsel took an exception, Tr. 291, to which Justice Posner responded:

> I told you I haven't ruled on the issue at all. If you can persuade me that the four hour interval between 11:00 and 3:00 itself constitutes some kind of constitutional violation that merits the suppression of the statement and you wish to reopen the *Huntley* issue, I will be happy to entertain a memorandum of law.

Tr. 292.

## Discussion

Petitioner contends that his confession was improperly admitted into evidence and that he was also prejudiced by the prosecutor's reference to statements of a non-testifying codefendant. Neither of the claims are sufficient to warrant the relief sought by the petitioner here.

### A. The Admissibility of the Confession

■ As a preliminary matter, resolutions of factual disputes by the state trial court judge are usually entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 464, 133 L.Ed.2d 383 (1995). As formulated by the Supreme Court in *Thompson,* the presumption applies to "basic, primary, or historical facts," which draw their substance from "a recital of external events and the credibility of their narrators." *Id.* The key issues here involve a determination of when petitioner was in custody for *Miranda* purposes and whether his confession was voluntary. These are mixed questions of fact and law that are not subject to the presumption. *See id.* 116 S.Ct. at 465. Although plaintiff now questions some of the findings of "historical" fact made by Justice Posner at the suppression hearing, the key fact—that Carpenter arrested and briefly questioned petitioner at 11 P.M.—was accepted by Justice Posner as true when it came out at trial.

### 1. Procedural Bar

■ Respondent argues that petitioner's claim that his confession was improperly admitted into evidence is procedurally barred. This is the conclusion reached by the Appellate Division in its written opinion, although the court's reasoning is less than lucid. The court's approach to the issue has three components. First, the court upheld the trial court's refusal to reopen the suppression hearing because defense counsel had a full opportunity to cross examine Carpenter at the hearing. Second, the court held that because petitioner had only claimed that his confession was not voluntary at the suppression hearing, the question of whether petitioner's "right to silence" was violated was not preserved for appellate review. *See Gagne,* 514 N.Y.S.2d at 801. Third, addressing the merits, the court held that under the totality of the circumstances, petitioner's confession to Bottari, which occurred several hours later and was preceded by *Miranda* warnings, was not tainted by Carpenter's very limited questioning.

Although the third ruling appears to be correct, respondent has relied on the first two in attempt to preclude an examination of the merits. Left unclear, however, by the Appellate Division's decision is the relationship between the denial of the motion to reopen the suppression hearing and the application of the procedural bar. Although the court's opinion treats the two grounds as alternatives, it appears to have understood the second ground—procedural bar—as a consequence following from the first ground. In other words, because the trial judge refused to reopen the suppression hearing, the only reviewable grounds for suppression were those presented at the original hearing.

■ The New York rule under which the application to reopen the suppression hearing was made and denied is CPL § 710.40(4), which provides:

> If after a pre-trial determination and denial of the motion the court is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion, it

may permit him to renew the motion before trial or, if such was not possible owing to the time of the discovery of the alleged new facts, during trial.

Petitioner correctly argues that a state procedural bar imposed pursuant to this rule will bar review in habeas corpus only if the rule is "strictly or regularly followed." *Barr v. City of Columbia*, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964). Respondent contends, however, that because the rule affords the trial court discretion, New York's general adherence to the rule meets the test for adequacy even if there is some degree of unevenness in its application. *See Wedra v. Lefevre*, 988 F.2d 334, 339–40 (2d Cir.1993) (upholding procedural bar where New York courts refused to extend time period for filing direct appeal).

The Second Circuit did state in *Wedra* that "an allegedly uneven application of state procedural default rules in general does not necessarily establish that the application of a procedural default rule in a particular case is not adequate." *Id.* at 340 (quoting *Andrews v. Deland*, 943 F.2d 1162, 1190 (10th Cir. 1991), *cert. denied*, 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992) (internal quotations omitted)). The holding in *Wedra*, however, turned on the fact that the cases in which New York courts had granted a discretionary exception were factually distinguishable from those in which extensions to appellate deadlines were denied. *Wedra* does not directly support the proposition that a discretionary procedural rule is adequate if applied differently to similar cases. The Court of Appeals for the Tenth Circuit, however, has sensibly suggested that state court's should be permitted an "occasional act of grace," which departs from the general rule, so long as the procedural rule has been evenhandedly applied "in the vast majority" of cases. *Andrews v. Deland*, 943 F.2d at 1190; *see Dugger v. Adams*, 489 U.S. 401, 410 n. 6, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) ("Moreover, the few cases that respondent and the dissent cite as ignoring procedural defaults do not convince us that the Florida Supreme Court fails to apply its procedural rule regularly and consistently.").

In his reply brief, petitioner (for the first time) cites a number of New York cases in which a trial court's refusal to reopen a suppression hearing pursuant to C.P.L. 710.40(4) has been held to be an abuse of discretion. These cases provide compelling support for petitioner's contention that he was denied what similarly situated defendants generally receive. For example, in *People v. Figliolo*, 207 A.D.2d 679, 616 N.Y.S.2d 367, 369 (1st Dep't 1994), the defendant had incriminated himself after voluntarily going to the police station for questioning. In his motion to suppress his statements, the defendant claimed only that he was never advised of his *Miranda* rights. At the hearing, a police officer testified that defendant had voluntarily agreed to go to the police station for questioning but was not actually arrested until later. At trial, however, the police officer conceded that he had arrested the defendant before bringing him to the station. Defense counsel moved to reopen the suppression hearing in order to consider whether the defendant's statements were the fruit of an illegal arrest. Under these circumstances, the Appellate Division concluded that the trial court abused its discretion in declining to reopen the hearing.

Significantly, the dissent in *Figliolo* pressed an argument that could have some force here. Specifically, Justice Sullivan reasoned that, "[i]f the defendant had been arrested at noon, as he now claims, he should have known that fact [at the time of the hearing]." *Id.* 616 N.Y.S.2d at 371. As a result, Justice Sullivan argued, the fact of defendant's arrest was not a fact that defendant could not have discovered with reasonable diligence. Nevertheless, the majority in *Figliolo* implicitly rejected this argument when it held that the focus of the inquiry should be on whether the government witnesses testified inconsistently, not on what the defendant should have known.

The same approach prevailed in *People v. Perez*, 104 A.D.2d 454, 478 N.Y.S.2d 968, 970 (2d Dep't 1984), on which petitioner most heavily relies. In *Perez* the one prosecution witness at the suppression hearing testified that the defendant was not in custody when he made the incriminating admission that provided the probable cause for his arrest. At trial, however, a different police officer

testified that the defendant had, in fact, been handcuffed before he made the statement. Under these circumstances, the Appellate Division, citing § 710.40(4), held that the trial court should have granted the defendant's motion to reopen the suppression hearing in order to determine whether the defendant's statement was the product of an illegal arrest. *See id.*

Respondent seeks to distinguish *Perez* based on the fact that Carpenter did testify at petitioner's suppression hearing and could, therefore, have been questioned at that time. Petitioner counters that because Carpenter was called as a witness by Donna Bell, a codefendant, rather than by the People, the failure of petitioner's counsel to cross examine Carpenter more fully can be excused. Both contentions are reasonable, but also beside the point. Unrecognized by the parties is that the holding in *Perez*, like *Figliolo*, turned on the fact that "potentially damaging testimony [came] from the mouth of a People's witness for the first time during trial," *id.*, not on whether aggressive cross-examination of the prosecution's witness at the suppression hearing could have elicited such testimony. *See also People v. Brigante*, 115 A.D.2d 547, 496 N.Y.S.2d 70, 73 (2d Dep't 1985) (remanding for reopened suppression hearing where police officer who did not testify at hearing testified at trial as to fact that might render search invalid).

Similarly, in *People v. Kuberka*, 215 A.D.2d 592, 626 N.Y.S.2d 855, 856 (2d Dep't 1995), the Appellate Division, citing *Perez*, again found an abuse of discretion in a trial court's refusal to reopen a suppression hearing under § 710.40(4). The defendant had originally moved to suppress evidence seized after an allegedly warrantless home arrest but the prosecution submitted an affidavit stating that the arrest had been made outside and that the search of the defendant's house was conducted pursuant to a search warrant. Based on the affidavit, the defendant's suppression motion was summarily denied without a hearing. At trial, however, a police officer testified that the arrest had indeed occurred in the defendant's home without a warrant and that a warrantless search had been conducted incident to arrest. The Appellate Division held that these facts "could not have been discovered with reasonable

diligence before the determination of the original motion." *Id.* Without addressing whether the defendant should at least have known the truth about where he had been arrested, the Appellate Division stated that, "[i]n the absence of any contrary information, the defendant was entitled to rely upon the People's misrepresentations that the defendant was lawfully arrested as he left his apartment and that all of the physical evidence recovered from his apartment was validly seized pursuant to a search warrant." *Id.*

Respondent cites no relevant cases denying a motion to reopen a suppression hearing, despite citing several that are clearly distinguishable. *See People v. Mercado*, 62 N.Y.2d 866, 478 N.Y.S.2d 253, 254, 466 N.E.2d 845 (1984) ("A court is not bound to grant a motion to reopen in order to entertain a new issue based on a change in the law announced after the motion to suppress has been denied."); *People v. Donovon*, 107 A.D.2d 433, 487 N.Y.S.2d 345, 352 (2d Dep't 1985) (stating in dicta that defendant could not reopen suppression hearing to develop facts relevant to recent change in the law); *People v. Robinson*, 100 A.D.2d 945, 474 N.Y.S.2d 836, 838 (2d Dep't 1984) (holding that statute did not authorize reopening of hearing on motion by prosecution). Nonetheless, respondent has an argument, albeit one not made, that petitioner's case is distinguishable because, unlike the precedents cited, the Appellate Division held that reopening petitioner's suppression hearing would not change the suppression ruling. According to the Appellate Division, even if Carpenter's trial testimony was accepted as true, it would not have tainted the confession petitioner made four hours later.

In contrast, in *Figliolo, Perez, Brigante,* and *Kuberka,* the Appellate Division indicated that consideration of the testimony given at trial might change the outcome, if not of the trial, at least of the suppression hearing. Indeed, in three of these cases, subsequent published decisions reveal that, after remand, the key evidence was suppressed and the charges eventually dismissed. *See People v. Figliolo*, 218 A.D.2d 927, 630 N.Y.S.2d 926 (1st Dep't 1995); *People v. Perez*, 122 A.D.2d

171, 504 N.Y.S.2d 548 (2d Dep't 1986); *People v. Brigante,* 125 A.D.2d 694, 510 N.Y.S.2d 19 (2d Dep't 1986). In *Kuberka,* which the Appellate Division remanded in May of 1995, no additional opinions have been published. All four of these cases illustrate the common sense principle set out in *Mercado,* which respondent cites for a different proposition and which addressed a slightly different issue. There, the Court of Appeals stated that a "threshold requirement" to reopening a suppression hearing is that the defendant "establish a factual predicate" for suppression either at the initial hearing or in the motion to reopen the hearing. *Mercado,* 478 N.Y.S.2d at 254, 466 N.E.2d 845. Although *Mercado* involved a change in the law rather than a change in the facts, the same minimal proffer of potential grounds for relief should, as a matter of judicial economy, be required before interrupting a trial to hold an evidentiary hearing. Rather than hide behind a procedural bar, respondent, as well as the Appellate Division, would have been well served to emphasize petitioner's failure to meet this threshold.

The net result of the inquiry into this procedural morass is that the procedural bar issue does not deserve the attention it has received. Cases applying § 710.40 exhibit a generous policy of reopening suppression hearings when it appears at trial that police officers did not tell the whole truth initially. At the very least, the general rule is to reopen the hearing where it appears that the new evidence would give petitioner at least some chance of prevailing on the merits. Moreover, the untruthful testimony of the police officers at the suppression hearing could constitute "cause" for failure to raise the right to silence issue earlier. In that event, petitioner would still have to show prejudice, which would again require some showing that petitioner's claim has merit.

In sum, if petitioner's claim had merit, the procedural bar could be overcome. This conclusion is consistent with what Justice Posner really did: decide that no additional evidentiary hearing was necessary but agree to consider the "right to silence argument" and

to revisit it after the trial if defense counsel provided any legal support for his position.[2]

*2. The Merits*

■ When a suspect invokes his privilege against self incrimination by attempting to cut off questioning, his request must be "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Campaneria v. Reid,* 891 F.2d 1014, 1021 (2d Cir.1989) · (holding confession inadmissible but upholding conviction under harmless error rule), *cert. denied,* 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). This rule, however, "is not a per se prohibition against all further interrogation," and renewed questioning will be permitted in certain circumstances. *Campaneria,* 891 F.2d at 1021. In *Mosley,* for example, the Court emphasized that the initial questioning was brief and had been preceded by warnings, two hours elapsed before questioning resumed, and the interrogation was conducted by a different officer about an "unrelated" murder. *See Mosley,* 423 U.S. at 104–07.

■ The circumstances of petitioner's confession are similar to those in *Mosley,* though less troubling. Four hours elapsed between the first and second attempts to question petitioner. The first questioning was brief and stopped immediately after petitioner indicated he did not wish to speak to Carpenter. When Detective Bottari reinitiated contact with petitioner, he gave a complete set of *Miranda* warnings. Under these circumstances, the police honored petitioner's right to remain silent perhaps even more scrupulously than in *Mosley.*

■ Nor is this conclusion undermined by the fact that the questioning was with respect to the same crime. "Questioning about the same crime does not of itself prove bad faith or undue pressure on the part of the police, especially where, as here, there is a substantial period between interviews and the police immediately terminated the prior interview when the defendant invoked his right to counsel". *Stumes v. Solem,* 752 F.2d 317 (8th Cir.1985); *United States v. Udey,*

---

**2.** The record does not contain any such memorandum and the parties never allude to its existence or argue that defense counsel's failure to

submit a memorandum is relevant to the issue of procedural bar.

748 F.2d 1231, 1242 (8th Cir.1984) ("this factor alone is not sufficient to find a violation"); *Kelly v. Lynaugh,* 862 F.2d 1126 (5th Cir. 1988); *United States v. Hsu,* 852 F.2d 407 (9th Cir.1988); *Grooms v. Keeney,* 826 F.2d 883 (9th Cir.1987); *United States v. Collins,* 462 F.2d 792 (2d Cir.) *cert. denied,* 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972).

Petitioner attempts to distinguish *Mosley* based on the fact that petitioner, unlike Mosley, did not receive any warnings before his initial questioning. Although the failure to give any warnings is a *Miranda* violation, the failure here should, as a practical matter, work against petitioner. When a suspect is told that he has a right to remain silent, invokes his right, but is then questioned again, the suspect would have reason to believe that any further attempt to invoke the right to remain silent would be fruitless. When, however, the *first,* and only, set of *Miranda* warnings is given at the start of the *second* attempt to question the suspect, the suspect has less reason to assume that the rights promised by the warnings will not be scrupulously honored. The absence of the initial warnings, therefore, makes it less likely that the subsequent confession was not voluntary.

Conversely, petitioner's case is distinguishable from *Westover v. United States,* decided together with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in which a defendant was questioned for several hours before receiving any advisory warnings and was then interrogated anew after receiving warnings. In those circumstances, the belated warnings were not sufficient to protect the suspect from coercion because "the warnings came at the end of the interrogation process." *Id.* 384 U.S. at 496. As the Supreme Court recognized in *Mosley,* the "cardinal fact of *Westover*" was "the failure of the police officers to give any warnings whatever to the person in their custody before embarking on an *intense and prolonged* interrogation of him." *Mosley,* 423 U.S. at 107 (emphasis added). Although petitioner's situation resembles Westover's insofar as he received no initial warnings, like Mosley petitioner was permitted to end his initial questioning easily and completely. Given these facts and the common sense approach of *Mosley,* petitioner's claim that his right to silence was not scrupulously honored is without merit.

The right to silence cases should be distinguished from a different line of cases, cited by petitioner, holding that an initial coercive interrogation, not merely a question in violation of *Miranda,* can taint a subsequent interrogation even if the later interrogation would not, by itself, be coercive. *See. e.g., United States v. Anderson,* 929 F.2d 96, 102 (2d Cir.1991) (suppressing second confession made shortly after defendant was tricked into giving initial confession). There is simply no evidence that petitioner's exchange with Carpenter so wore down his will so as to render his second confession involuntary. On the contrary, Carpenter's questioning was very limited, was conversational in tone, and stopped immediately when petitioner indicated he did not want to respond. In addition, because petitioner did not incriminate himself during the initial questioning, petitioner would not have thought "he has little to lose by repetition." *Quartararo v. Mantello,* 715 F.Supp. 449, 462 (E.D.N.Y.) (quoting *Darwin v. Connecticut,* 391 U.S. 346, 350, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (Harlan, J. concurring in part and dissenting in part)), *aff'd,* 888 F.2d 126 (2d Cir.1989).

Also distinguishable is *Anderson v. Smith,* 751 F.2d 96, 102 (2d Cir.1984), in which the defendant invoked his right to remain silent after his initial questioning *and* after questioning resumed. Under those circumstances, the Court of Appeals for the Second Circuit held that even if, based on the initial questioning, the defendant "did believe that the police would respect his rights, he could hardly have maintained that belief in the face of [the police officer's] refusal to accept his silence" during the subsequent session. *Id.* Here, petitioner did not invoke his right to remain silent at the second interrogation.

Finally, the cases strictly enforcing a suspect's request for counsel are clearly inapposite. *See, e.g., Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In *Edwards,* the Supreme Court held that, although an accused may waive the right to remain silent by agreeing to answer questions, "additional safeguards are necessary when the accused asks for counsel." *Id.* 451

U.S. at 484. In such cases, the accused, not the police, must be the one to initiate further questioning. *Id.* at 484–85. There is no evidence, however, that petitioner requested an attorney at any time after he was in custody. He did testify that he attempted to call his lawyer shortly after arriving at the police station, but he was not in custody at that time and it is also not clear that the police knew whom petitioner wished to call.

Petitioner correctly argues that resolution of the *Miranda* issue depends on the truth of the testimony of the police officers that he was not questioned between 11:00 P.M., when he was taken into custody, and 3:00 A.M., when he was advised of his rights and questioning was resumed. The record does present conflicting versions of the events between 11:00 P.M. and 3:30 A.M. It is not in serious dispute that petitioner was told he was under arrest at 11:00. Nevertheless, the critical evidence supporting the claim that petitioner then said he did not wish to speak came from Detective Carpenter. Petitioner did not testify that he invoked his right not to speak at 11:00 or that he was questioned after he asserted that right.

While petitioner testified that questioning resumed at 1:30 A.M., rather than 3:00 A.M., he admitted to confusion about the exact time. HD 38. On the other hand, each of the police officers denied that petitioner was interrogated between 11:00 P.M. and 3:00 A.M., although the A.D.A. who arrived at the stationhouse at approximately 1:30 A.M. testified that "he believed" that Lt. Kelly, who was in charge of the investigation, told him that petitioner "had made some statements but they were continuing to talk to him." HA 20.

This testimony suggests that some witnesses may have been mistaken, confused or untruthful. Nevertheless, the issue was resolved against by the trial judge in his hearing opinion. Petitioner resp. Ex. B, at 6. The best that can be said from petitioner's standpoint is that the evidence was "inconclusive with respect to whether any police officer besides Carpenter questioned—or attempted to question—petitioner from the time he was admittedly in custody through the time he was finally read his *Miranda* rights at 3 A.M." Petitioners Memorandum of Law, dated March 1, 1996, at 15 ("Petitioner's Memorandum"). Because the trial judge made his finding on this based on his view of the credibility of the witnesses at the suppression hearing, the "inconclusive" state of the record is insufficient to overcome the presumption of correctness which attaches to those findings. 28 U.S.C. § 2254(d)(8); *see Wainwright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (both holding that where two conclusions find fair support in the record, the habeas court must not substitute its view of the facts for that of the state tribunal).

Nevertheless, petitioner argues that the trial judge should have reconsidered his findings of fact after it was conceded at trial, contrary to the suppression hearing testimony, that petitioner was taken into custody at 11:00 P.M. Because this concession established that petitioner truthfully testified in this regard, and because Detective Carpenter testified at trial that petitioner refused a request to speak to him at 11:00 P.M., petitioner argues that the trial judge should have considered whether petitioner's testimony that, at about 12:30 or 1:00 A.M., he was asked whether he "wanted to make a statement," T. 38, should also have been credited.

> The need for a time-out to sort through all these conflicts in light of such pivotal new facts as were first admitted by police witnesses at trial—again that petitioner was in custody, was not given *Miranda* warnings, was subjected to police questioning, and had at least once invoked his right to remain silent—was glaring.

Petitioner's Memorandum at 16.

The flaw in this argument is that the trial judge was never asked to reconsider his findings of fact at all, much less on the occasion of the motion to reopen the suppression hearing. Indeed, my reading of the mid-trial motion to reopen leaves me with the same impression as it did the trial judge; petitioner argued only that because he indicated that he did not wish to speak at 11:00 P.M., when he was taken into custody, the resumption of questioning at 3:00 A.M. was improper. Tr. 288.

Under these circumstances, it is unclear what can reasonably be done at this point, more than 13 years after the suppression hearing and almost 14 years after the petitioner confessed. The trial judge was indisputably in the best possible position to reconsider his findings of fact on a record that was then fully developed. The presumption of correctness that attaches to his factual findings has not been overcome, and a hearing fourteen years after petitioner confessed would yield nothing in the way of a meaningful record on which to make new credibility findings.

Moreover, petitioner's own testimony provides no support for the claim that the circumstances of his interrogation rendered his confession involuntary. On the contrary, petitioner admitted that he had been arrested on prior occasions and that he was fully aware of his *Miranda* rights, HD 40, although he claimed that he was not apprised of them. While petitioner claimed to have been interrogated, he did not say that he confessed or that he felt compelled to speak because of fatigue or psychological pressure. Instead, petitioner's testimony suggests only that he did not say anything self-incriminatory and had no intention of doing so; it does not suggest an unwillingness to answer questions. This is a subtle, although critical, distinction both in terms of the voluntariness of the waiver of petitioner's right not to speak and the voluntariness of his self-incriminating statement.

Petitioner's testimony regarding his questioning at 1:30 A.M. is illustrative. Petitioner testified that after he was advised that Donna Bell confessed, he denied that he was either present during the murder or that he, Donna, and his brother had broken into the victim's apartment. HD 44. In response to a question about Donna Bell's motive, he said only that he "had known she wanted her [mother] out of her life but a murder wasn't her style. A burglary maybe to harass her, but a murder, no." HD 39.[3]

Subsequently, after seeing Donna Bell making a videotaped confession, petitioner testified that he told Detective Donaldson that he had "nothing else to say," and that

Donaldson replied "if you're not going to make a statement then we're through talking to you and they threw me in the bullpen." HD 39. Petitioner then went to sleep. HD 40.

■ Assuming petitioner's testimony regarding his response to Donna Bell's confession is not credited, and the police testimony is credited, the latter does support the conclusion that the sight of his accomplice girlfriend confessing moved petitioner to confess. Nevertheless, this is not sufficient to render his confession involuntary. *See* Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.2, at 447 (1984) ("Clearly, there is nothing improper with confronting the suspect with actual evidence against him[.]"); *Derrick v. Peterson*, 924 F.2d 813, 819 (9th Cir.), *cert. denied* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991); *Williams v. State of Ohio*, 547 F.2d 40, 41 (6th Cir. 1976), *cert. denied* 435 U.S. 998, 98 S.Ct. 1654, 56 L.Ed.2d 88 (1978); *see also Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (confession not involuntary where police falsely advised defendant that he had been implicated by his accomplice); *Green v. Scully*, 850 F.2d 894 (2d Cir.), *cert. denied*, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988) (same).

### B. References to Donna Bell's Confession

■ In her opening statement, the Assistant District Attorney described for the jury the circumstances that led to petitioner's confession:

> You will hear that Donna [Bell] made a statement to the detective. And the detective said to Stephen Gagne, Donna made a statement, he said no I can't believe it. I can't believe it. She wouldn't do that, was his answer.

Tr. 38. After an objection by petitioner's counsel, the trial judge ruled that he would not permit testimony as to the content of Donna's statements, but "[a]nything that the policemen said to [petitioner] and anything he said to the policemen may be admissible." Tr. 40. This evidence, which related to the

---

**3.** Petitioner also testified that he answered questions much earlier that evening without any suggestion that he invoked what he understood was his right not to speak. HD34.

circumstances under which petitioner confessed, was relevant to the voluntariness of petitioner's confession which he chose to place before the jury.

Notwithstanding the trial judge's ruling, on the direct examination of Detective Bottari, the prosecutor asked, "Did Detective Donaldson inform you that Donna Bell had incriminated Steven Gagne?" Tr. 180. After an objection was sustained, the prosecutor asked, "Did you find out information concerning Steven Gagne?" *Id.* The judge sustained another objection, then sent the jury out and further admonished the prosecutor: "if you pull that kind of tactic again you may be running the risk of a mistrial." Tr. 181. Subsequently, the prosecutor did occasionally refer to the fact that petitioner confessed only after Donna spoke with the police, but never again explicitly alluded to the content of her statement. Nor did she refer to the content of Donna's statement during her summation. Tr. # 2 112.

Moreover, the trial judge instructed the jurors that they were "not to speculate as to the substance" of Donna Bell's statement, and that "you must strike from your mind any reference that might have been made to the substance of that statement during the trial." Tr. # 2, 160. The strong cautionary instruction concluded with these words:

> The contents of the statement is not part of the evidence in this case for legal reasons, and you are not to consider it in arriving at your verdict.

*Id.*

■ On appeal, the Appellate Division held that, assuming the references to Donna Bell's statement were improper, "any errors were harmless in view of the overwhelming evidence of guilt." *People v. Gagne,* 514 N.Y.S.2d at 801. Whether the prejudicial effect of the references to Donna Bell's statement substantially outweighed its probative value is a close question. While it is true that only the content of Donna's confession is itself hearsay, the Confrontation Clause also prohibits a prosecutor from "creat[ing] in jurors' minds the impression that a codefendant's unreported statement" implicated the defendant in the crime. *Mason v. Scully,* 16 F.3d 38, 43 (2d Cir.1994). The record here left such an inference. However, some reference to the circumstances that led petitioner to confess was necessary because it was relevant to the issue of the voluntariness of his confession.

Indeed, it was only with respect to this issue that the prosecutor referred to Donna Bell's confession in her summation. Tr. # 2 111–113. The concluding paragraphs are illustrative. After observing that petitioner told Detective Bottari that he did not believe that Donna Bell had "made a statement," *id.* at 111, the prosecutor observed:

> Detective Bottari once again talks to Lieutenant Kelly, and at that point he takes this man, Stephen Gagne, over to where Donna Bell was making statement.
>
> Now, ladies and gentlemen, at that point did Detective Bottari use any force? Did he trick him, did he say, "oh, look, this is what happened." Did he trick him in any way? I submit to you the answer is "No." Did he deceive him in any way, in any concept, way or form, and I submit to you once again "No." Then ladies and gentlemen, Stephen Gagne did make a statement to the Detective Bottari.

*Id.* at 113.

Because of concern about the ability of a jury "to ignore the probative value of a truthful but coerced confession," the Supreme Court has held that a defendant is entitled to have the voluntariness of a confession determined by the judge at a pretrial hearing. *Lego v. Twomey,* 404 U.S. 477, 483, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The issue, however, is inevitably relitigated before the jury. Indeed, in this case petitioner specifically asked the judge to charge the jury that it "may determine whether or not the defendant's statement was voluntarily made, and, if not, disregard the statement," Tr. # 2 39B, and there was lengthy colloquy regarding the substance of the charge that was ultimately given. Tr. # 2 39A—M.

■ Moreover, even if references to the fact that Donna Bell made a statement were entirely impermissible, not every error of this kind warrants habeas relief. Indeed, even the admission of a full blown confession of an accomplice may be harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d

284 (1969). On collateral review, however, a less demanding standard controls harmless error analysis. *See Samuels v. Mann*, 13 F.3d 522 (2d Cir.1993). Indeed, "to conclude that the error was harmless in a case of this kind, we need not find that the improperly admitted evidence had no effect at all, *see United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir.1992), we need only find that the effect was not substantial and injurious." *Samuels*, 13 F.3d at 528 (internal quotations omitted). "The most dispositive factor in this analysis is the overall strength of the prosecution's case." *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir.1996). The evidence need not be overwhelming, it need only be weighty. *Id.*

During the five-day trial of this case, the central piece of evidence against petitioner was his own confession. Moreover, there was also ample additional evidence that directly inculpated petitioner. Particularly incriminating was the testimony of Michael Anglen, a petty criminal who claimed that he had plotted with petitioner and Donna Bell to steal Palmina Bell's ATM card. According to Anglen, petitioner and Donna had explained to him that Palmina Bell had recently inherited some money from Donna's father. Donna felt that she was getting a "raw deal" with respect to the inheritance and that they intended to get access to the money by stealing Palmina's bank card. The trio's attempt to snatch Palmina Bell's purse in November 1982 was unsuccessful. Afterward, Anglen and petitioner plotted to break into Palmina Bell's house, murder her, and steal the card. Tr. 445, 482. Specifically, in a conversation that took place on January 1, 1983, petitioner told Anglen that Palmina Bell "would have to be done away with in order to get what they were after." Tr. 445.

While Anglen was not a witness of model character, his testimony regarding petitioner's expressed desire to eliminate Palmina Bell was corroborated by a recorded post-arrest statement which Anglen gave on January 6, 1983, three months before the murder. There he stated that, on January 1, 1983, "Steve Gagne made mention of the fact that he wanted to eliminate Palmina Bell with reference to the inheritance of Donna Bell." Tr. 486. Before the murder plan was carried out, Anglen apparently left New York for Alabama while criminal charges, some of which arose out of the purse snatching incident, were pending against him.

Anglen's testimony regarding the possible motive for the robbery and murder of Palmina Bell on April 6, 1983, was corroborated by bank records which showed that three withdrawals totaling $600 were made using the card on the two days following Palmina Bell's death. Tr. 499. In addition, Palmina Bell's neighbor testified that he saw Donna and two young men leaving Palmina Bell's house at approximately 5 A.M. on the day the Palmina's dead body was later found. Tr. 398. The neighbor's son testified that he saw Donna, Steven, and Louis in the same car, driving slowly around the block several times at approximately 3 P.M. that day. Tr. 496.

In view of all of this evidence, the strong cautionary instruction by the trial judge, and the fact that some reference to Donna Bell's statement was relevant to the voluntariness issue which was before the jury, the references to her statement could not have had a substantial and injurious effect on petitioner's trial. *See Richardson v. Marsh*, 481 U.S. 200, 208–09, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (Where a co-defendant statement was redacted to remove reference to "[s]pecific testimony that 'the defendant helped me to commit the crime,'" and was incriminating only in combination with other evidence, a cautionary instruction was more likely to be effective than where such detail is included).

## Conclusion

For the foregoing reasons, the petition is denied. Petitioner's application for a Certificate of Appealability pursuant to Federal Rules of Appellate Procedure Rule 22 is granted.

SO ORDERED.